# The Mussel Slough Case.

(*Circuit Court, D. California.*)

1. Conspiracy.

A conspiracy is a combination of two or more persons by some concerted action to accomplish some criminal or unlawful purpose.

2. Same—Evidence.

The evidence in proof of a conspiracy will generally, from the nature of the case, be circumstantial, though the common design is the essence of the charge.

3. Same—Same.

It is not necessary to prove that the defendants came together and actually agreed, in terms, to have that design and to pursue it by common means. If it be proved that the defendants pursued by their acts the same objects, often by the same means, one performing one part and another another part of the same, so as to complete it with a view to the attainment of the same object, the jury will be justified in the conclusion that they were engaged in a conspiracy to effect that object.

4. Marshal—Obstruction and Resistance in Executing a Writ. —[Ed.

Sawyer, C. J., (*oral charge.*) This long case is about drawing to a close. Counsel have performed their duty; it now remains for the court to perform its duty; and then it will devolve upon you to perform yours.

It is the duty of the court to give you the law applicable to this case, and it is your duty to receive it from the court, and to act upon it as so given to you. The declaration of the law is strictly and solely the province of the court, and your functions are simply to ascertain the facts. Of the facts you are the sole judges. You are the judges of the weight of the testimony, and the credibility of the witnesses, and it is for you, from all the testimony in the case, to determine the facts, and when you determine the facts it is your duty to announce that determination, whatever your sympathies may be. You will examine this case fairly, calmly, impartially, and declare the result as it strikes your minds from all the testimony in the case. You will not allow yourselves to be governed by sympathy or drawn aside from the issues by any outside considerations. You have nothing to do with the punishment;

you are simply to determine the question whether these parties are guilty or not guilty of the offences charged. The responsibility of the punishment is upon the law and the court.

In view of these instuctions, gentlemen, you will examine the testimony in the case for the purpose of ascertaining the facts. The statute of the United States provides that "if two or more persons"—and there may be but two—"if two or more persons conspire to commit any offence against the United States, and one or more of such parties do any act to effect the object of the conspiracy, all the parties to such conspiracy shall be liable to a penalty," etc. That is one provision of the statutes, gentlemen, and there is a charge in this indictment framed upon that provision charging these defendants, with several other parties who are not on trial, and others to the grand jurors unknown, with conspiracy. There must be two at least to form a conspiracy. If there were any two of these defendants that conspired to commit the offence charged, there was a conspiracy. The conspiracy charged is to commit the offence of resisting and obstructing the United States marshal in the execution of the writ set out. If you find that two or more are guilty of the conspiracy, then you must find those guilty as to whom you find the testimony sufficient to justify such a verdict.

There is another clause, gentlemen of the jury: "Every person who, knowingly and wilfully, obstructs, resists, or opposes any officer of the United States in serving, or attempting to serve or execute, any mesne process or warrant, or any rule or order of the court of the United States, or any other legal or judicial writ or process, or assaults or beats or wounds an officer duly authorized in serving or executing any writ, rule, order, process, or warrant, shall be punished," etc.

Now, gentlemen, there are two charges in this indictment: one is that these defendants, with others, conspired to obstruct and resist the United States marshal in executing a writ, and doing some act to effect the object of that conspiracy; and the other is, in actually obstructing or resisting the marshal in the execution of the writ. Those two

offences are charged in this indictment, and those are the questions for you to examine.

Gentlemen, anything outside of the question as to whether the defendants, or some of them, are guilty of conspiring and taking some measures to carry out the object of the conspiracy, and of the issue as to whether there was any obstruction or resistance of the marshal in executing the writ, is irrelevant to this matter. There has been a large amount of testimony introduced here, gentlemen, simply as bearing upon the question of conspiracy and intent. When you get beyond that— beyond throwing any light upon those issues—you are to discard it.

Gentlemen, there was a judgment in favor of the Southern Pacific Railroad Company against the two parties, Storer and Brewer, put in evidence, and a writ of execution issued upon that judgment. You have nothing whatever to do with the merits of that controversy. The law has appointed courts to settle such controversies. It does not allow the parties to determine their own cases. It provides a judiciary for the purpose of inquiring into and settling legal controversies. When this controversy between the Southern Pacific Railroad Company and Storer and Brewer was tried by the court and the judgment entered, that settled the matter for all time, unless that judgment should in some form be set aside. The merits of the controversy, or as to whether there was any error in the judgment, is not a question for you to consider; it is not before you at all. You are to presume it was settled correctly until otherwise determined. At all events it was so settled, whether correctly or erroneously does not matter for the purposes of this case.

There was but one way of lawfully preventing the execution of that judgment when demanded by the plaintiff, and that was by an appeal to the supreme court of the United States, taken within the proper time, and in the mode prescribed by law. If no appeal is taken, and the judgment is not reversed, that judgment is just as binding, just as final, as though it were a judgment of the supreme court of the United States. It settles the rights of those parties for all

time. Even if, in the appeal of the three cases that were appealed, those judgments should be reversed, it would in no way affect this judgment. The only way of affecting this judgment is to reverse it or to set it aside by some other recognized judicial proceeding in the courts; and, the judgment being perfected, the time for staying proceedings on appeal having expired, the plaintiff had a right to the execution of that writ, and it was the duty of the government of the United States, if it required all the force within its control, to execute that writ and that judgment; and if the government should fail to execute that writ, while that judgment stands and is still subsisting, it would fail to perform the proper and most important functions of the government, and if it should submit to the resistance anarchy would necessarily come.

Any one who conspires to resist the execution of that writ commits an offence against the laws of the United States, and any one who resists the officers in the execution of that judgment and writ commits an offence against the laws of the United States; and those are the offences that are charged in this indictment, and you have simply to inquire whether those offences have been committed or not, without reference to any other or any extraneous questions or considerations.

Now, gentlemen, a conspiracy is "a combination of two or more persons by some concerted action to accomplish some criminal or unlawful purpose." That is the definition of conspiracy, so far as it is applicable to this case. "A combination of two or more persons"—it may be two, but there must be at least two, and there may be more—"by some concerted action to accomplish some criminal or unlawful purpose."

Now, there is a charge here that these defendants, with others, concerted together to resist the marshal; that there was a concerted action; that they conspired together to resist the marshal. Gentlemen, the evidence of conspiracy is generally circumstantial. It is not to be supposed that parties enter into a formal written or verbal obligation, or, if they do, that the obligation can be proven in terms. "The evidence in proof of a conspiracy will, generally, from the nature of

the case, be circumstantial, though the common design is the essence of the charge." That is, the design entertained by each to perform the act. "It is not necessary to prove that the defendants came together and actually agreed in terms to have that design and to pursue it by common means. If it be proved that the defendants pursued by their acts the same objects, often by the same means, one performing one part and another another part of the same, so as to complete it with a view to the attainment of the same object, the jury will be justified in the conclusion that they were engaged in a conspiracy to effect that object."

Now, gentlemen, you are to consider, from the circumstances of this case, whether there was a conspiracy to effect this object of resisting the marshal. There is testimony here tending to show that there was a combination of men formed for the purpose of resisting the Southern Pacific Railroad Company in the occupation of the lands claimed by it, and patented to it by the government, being the odd sections of land. There is testimony tending to show that there was a combination for that purpose, and that, at an early stage of the case, there was an organization and a constitution adopted, with subordinate leagues, and a pledge, which the testimony tends to show was taken,—whether it does show it or not is a question for you to consider and determine,—and that pledge is in language which follows:

"That we recognize no rights of the Southern Pacific Railroad Company to our homes, and that the Southern Pacific Railroad Company or its assignees cannot peaceably enjoy the benefits of our several years of toil to our exclusion; and that in placing our signatures to this resolution we do it with the firm resolve to stand by each other in the protection of our homes and our families against this fraudulent claim of the Southern Pacific Railroad Company; and that we will stand as one man till our cause is decided by the United States supreme court."

That resolution, you will see, gentlemen, is broad in its terms. It makes no exception of the judgments of the lower courts, or of the state courts, but whether it intended to em-

brace those or not, is a question for you to determine upon all the evidence, and not for me. You have heard the language of the resolution, and I merely call your attention to that as one of the circumstances which are relied upon as tending to show a conspiracy to hold these lands at all events and against all authority.

Now, I shall not go minutely into these other circumstances, of midnight raids, or as to who performed them, or the notices given to persons who purchased of the railroad company against the wishes and consent of the league; nor especially refer to those persons whose houses were burned; nor to those masked men who, by their threats, induced the agent of the company, who was there to grade the lands, to leave; nor to the midnight pursuit by masked men of those who dared to purchase of the railroad company,—except to call your attention to them as circumstances which are claimed on the part of the prosecution as tending to show the length and breadth of this conspiracy, if there was any such conspiracy. The government claims that there was a conspiracy, and claims that it not only extended to the lands, but, further, that it extended to an intention to resist the process of the lower courts, at least until a decision should be had from the supreme court of the United States. These are circumstances which you are entitled to consider in connection with all the other circumstances of the case. But I shall pass over this without any further comment—without any comment as to the credibility of the testimony, or as to the fact at all, except that the testimony points to this organization as the only one having any cause of complaint against the parties settling upon those particular lands, or purchasing those lands from the company.

We will come down now, gentlemen, to the eleventh of May. The testimony is claimed to show that it was known in that district by many, and, by some of the defendants at least, prior to the eleventh of May, that executions had been issued, but the testimony of the witnesses is that they did not know at what time the marshal would appear; that a meeting was called at Hanford on the morning of the elev-

enth of May—a picnic to take into consideration these matters—at which it was expected Judge Terry would deliver an opinion, or make an address, one or the other, upon the subject. It is in testimony also, gentlemen, that the marshal, with Mr. Clark, the grader, who was familiar with the land, and who accompanied the marshal, to point out the land, arrived at Hanford on the evening before, and on the morning of the eleventh of May went in pursuit of Crow and Hart, who were two of the purchasers of the railroad lands, and whom he was directed to put in possession of certain lands, among them the lands claimed and possessed by Braden, and the land claimed and possessed by Storer and Brewer. The testimony tends to show that Hart had either purchased of the railroad company, or leased the lands held by Braden, and one other piece of land, and that Crow had purchased the land which was embraced in the judgment and writ against Storer and Brewer; and that the company had authorized the marshal to put them in possession of those lands.

Now, gentlemen, tnose lands being adjudged to be the property of the railroad company, whatever title the railroad company had in them, Hart and Crow had a right to purchase, and no one had any right to interfere with their purchases. Whatever their interest was, whatever their title was, after the title had been adjudged to be in the company, Crow and Hart had a right to purchase it, and they had a right, by the assent or direction of the company, to be put in possession under those judgments and executions, and any one forcibly opposing their being put in possession would be acting in violation of the law.

Not finding Hart at the town of Hanford, the marshal and Mr. Clark started upon the road towards the land, as the testimony tends to show. They afterwards met them on the way, and first went to Braden's place. Not finding any one there, they removed his goods into the streets or county road, and the marshal delivered formal possession to Hart. They then went to the place of Storer & Brewer. They met Storer upon the way, and after some conversation in relation to the

subject, and his being informed that the marshal was there for the purpose of putting Crow in possession, one of them said—Crow, I think—" Why can't we settle it ?" and there was some conversation on the subject. They stood aside and conversed by themselves. Storer said : " Well, come on boys, we will go down and see my partner" or "my friend." They went down to the land. I need not go over the circumstances. They went into the enclosure on the even section adjoining with Storer—what they call the homestead lot—and the marshal and Clark and Crow and Hart remaining while Storer went to converse with his partner. The testimony also is that the news of the marshal's arrival became noised abroad in Hanford at once ; that it became known to the settlers, and, among others, to these defendants in various stages of the case ; that the marshal was there with his writs ; that he and Crow and Hart had gone out with a view of executing the writs. Now, gentlemen, you have heard the testimony about how these parties all arrived upon the grounds, but the testimony all tends to show that they gathered their men together, and that some of them—McQuiddy, their leader, and some others—requested them to get as many men as they could ; that they wanted to make an impressive representation to the marshal. There was a concert of action, as the testimony all tends to show, and it is not contradicted, in going there. They all went there, several miles out of the way, to a place in which they had no personal concern. There appears to have been a concert of action in going there and assembling at the place. They gathered their friends together, as the testimony tends to show, upon the way. Now, if that was so, if they went there by any concert of action, that is one element in the conspiracy. That, of course, does not make a conspiracy alone, but if there was a concerted action on their part, and they all came together from different portions around there by concert of action or agreement, I say that is one element pointing to the conspiracy.

Now they went there for a purpose. That they all admit. The testimony all shows that they had a purpose in going. If that purpose was an unlawful one, that is another element

in the conspiracy. They say now that that purpose was to persuade the marshal not to execute the writ. That was one; another one was that they had heard threats that Brewer's life would be in danger. That was another purpose. This is what they say, the law at this time permitting them to testify in this matter, and as they say it, it is testimony in the case, and you are entitled to consider it—to consider if there was a purpose of some kind in going there, and whether that purpose was a lawful or an unlawful one.

On the other hand it is alleged that there was another purpose, and that purpose it is insisted is shown by the surrounding circumstances to have been an unlawful purpose—a purpose to resist the marshal. The fact that they went for a lawful purpose merely you are not to assume, unless you believe that that is the true state of the case—the true condition of things from all the circumstances in the case. And you are entitled to consider what they did at that time; whether what they did at the time, and constituting a part of the transaction itself, is consistent with what they now declare, subsequently to the event, to have been their purpose or not.

What was done when they came upon the ground the testimony all shows. It is not substantially contradictory. Storer had just left Crow and Hart. There is no testimony that any ill-feeling was manifested between them; there is no testimony that any dispute or harsh language was used among them that morning. The testimony simply indicates that they were talking in a friendly way. Storer had just left for Brewer, who was plowing in a field near by, both in sight of these parties as they arrived. Now, when the defendants and their associates arrived, seeing a large number of men, estimated anywhere from 13 to 25 or 30, according to the different views which the several witnesses took of it, whatever the number was,—certainly it was not less than 13, because that is the lowest number that it is put at,—when Hart and Crow saw those men they made an expression, as the testimony tends to show, which indicated that they expected difficulty. The marshal testifies to you that he directed them to stay where they were, and keep quiet in their wag-

ons, saying that he would go down and meet them.    The marshal testifies, and it is not contradicted, that he went down to meet them some 50 or 60 yards from where he had left these parties sitting in the wagon side by side together, Crow and Hart in one wagon and Clark in the other.    He says he spoke first to these parties and said: "Good morning, gentlemen."    A conversation immediately was entered into.    He says he told them that he was the United States marshal; that they expressed to him the fact that they were aware of that fact.    He says, and he repeats it upon several occasions, that they told him he could not execute that writ.    They intimated that they had knowledge of the fact that he was there with a writ to execute, and he says they told him he could not execute that writ; that he told them they were "too fast," and undertook to read the writ, but they told him there was no use of reading the writ at all; that they understood it and did not want to hear the writ; that he put it up; that then immediately several pistols were drawn upon him, and they demanded that he should surrender his arms and directed him to consider himself a prisoner, one ordering him to surrender his arms upon peril of his life.    He testified that he should judge at least half a dozen pistols were drawn upon him; that he heard the clicking of the locks as they were cocked; that they demanded that he surrender his arms, and directed him to consider himself a prisoner.    That is substantially the whole of the conversation which is related on that occasion.

Now, the testimony of Wilbur Doyle confirms that to a certain extent; the testimony of Clark and of the others, including the defendants, confirms it to a certain extent, with the exception that the defendants themselves, some of them, attempt to mitigate the expression; but they admit that the marshal was ordered to surrender his arms, and to consider himself their prisoner, and admit that there was one or more pistols drawn.    Some of them say they only saw one.    The marshal, however, said he saw, he thinks, at least half a dozen.

Now, gentlemen, that is not the language and those are
v.5,no.8—44

not the acts of persuasion.  If the parties came there and used that language, and performed those acts, that is the language of threats, and those acts are acts of menace.  The marshal says they were standing at the time in a circle around him, from six to twelve feet off.  Now if these parties drew their pistols in that way upon him in a threatening manner, that of itself was an assault; it was an offence at common law; it was menace; it was an obstruction of itself; and if those acts took place as stated by him there and then, and not contradicted by the other party, that of itself was an obstruction to the marshal in the execution of his writ, provided he was there for that purpose, and intending to execute the writ.

Now, the fact that he was not on the piece of land at that moment of time does not change the aspect of the case.  The fact that he was waiting a few moments to see what would be the result of that conference does not affect the case.  If he was there for the purpose of executing that writ, and intending to execute it, and was menacingly forbidden to execute the writ, and obstructed in its execution, they knowing that he was there for that purpose, and threatening and menacing him for the purpose of preventing the execution of the writ, that was a resistance within the meaning of the law at that point, before any other or further act was performed; and, as I said before, gentlemen, that is not the language of persuasion.  And this was done, as all the testimony shows, in a very short time—only a few seconds of time, or a few minutes at the outside.  All of this indicated a purpose which the marshal would understand, and which he had a right to understand, as intending to interfere with the execution of the writ.  The acts themselves indicated a purpose, and the purpose manifested by those acts could only be a purpose of resistance.  Now, if that was their purpose, and you are entitled to consider the natural purport of the acts, you are entitled to consider the outward manifestation of those declarations and acts in determining the question whether what they now say was their purpose, was the true purpose or not.

Now, then, if they told him he could not execute those writs;

if they drew their pistols upon him and committed an assault by levelling them at him, cocked and within a few feet distant, demanding the surrender of his arms in a menacing manner, and telling him to consider himself a prisoner,—that, I say, was an assault, a forcible obstruction within the meaning of the law, and the act of resistance was made out. And if the purpose of their coming there—if they came there by concert, as it is evident from their own testimony that they did—if they came there by concert and with that purpose, that purpose being an unlawful one, then there was a conspiracy, and you are to determine what that purpose was from all the circumstances of the case. If they came there simply to persuade, simply to defend Brewer, if it were necessary, that would not be unlawful. There was nothing indicated by the evidence to show that there was any occasion in fact of defending Brewer from an unlawful assault on that morning. They seem to have come there as volunteers. There is no testimony tending to show here that Brewer and Storer had invited them to come there, or desired them to come and interfere in their affairs; they were there apparently as volunteers, so far as the testimony in the case shows. If there is any testimony to the contrary, you will remember it and give effect to it, gentlemen, because I only state my impression, and you will take your own recollection of the testimony, not mine. Brewer had not been disturbed in his work. He was still plowing, according to the testimony. Storer had just gone out to meet him, after meeting Crow in friendly conversation. There was nothing then which had occurred that called upon them to change that friendly purpose they now avow, for there was as yet no occasion for protecting Brewer's life. Nothing else had occurred there, as indicated by the testimony, to require a change of purpose.

Now, then, under the circumstances, if what they did is an evidence of what their purpose was, and if they resisted or obstructed the marshal in the sense which I have described to you, then that is evidence that their purpose in coming was to do that thing which they did do, viz., to resist the marshal; whether sufficient evidence or not is a question for

you to determine from all the evidence. If they by concert came there for that purpose, then there was a conspiracy, and if there was a conspiracy then the act of one is the act of all the conspirators. If there was not a conspiracy, then the act of each party was an individual act; but if there was a resistance in the mode which I have stated, then all the persons who were present, aiding and abetting, assenting to or approving of that resistance, are *particeps criminis* in the resistance, and it is for you to determine who did aid and abet, who were there present and assenting; and the fact of their being there apparently approving, and not interfering or interposing, if such be the fact, is a circumstance for you to consider in determining whether they were assenting and aiding and abetting in carrying out their then present purpose.

Now, gentlemen, Hart or Crow was there to receive possession of that land described in the writ from the marshal. The testimony tends to show that Clark was there to point out the lands, he being familiar with the locality. They were a part of the machinery or agencies that were there to be employed for the execution of that writ. They were there rightfully; they were there under the protection of that writ, as much so as the marshal himself. In order to give possession to Crow it was necessary that Crow should be there, and in order to identify the land it was necessary to have some one familiar with it there to point it out. They were there as a part of the machinery of the marshal—a part of the agencies employed—for the purpose of the execution of that writ, and were as much under the shield and protection of that writ as the marshal himself; and any obstruction to their receiving the possession which the marshal should attempt to give to them would be an obstruction to the execution of that writ.

Although the condition of things which I have pointed out and supposed here would make out the offence, still we may proceed further in this matter and consider subsequent events which the testimony discloses. Now, there was testimony here tending to show that Crow had, on various occasions,

made threats against members of the settlers' league. You have heard that testimony, gentlemen, and the theory of the defence is that these parties anticipated that Crow would kill Brewer, and that they came out, as one of their purposes, to prevent that act. Gentlemen, you have heard the testimony in regard to those threats. One complaint was that Crow had, at his house, arms and a large number of cartridges—300 cartridges. You are to consider whether or not that is not entirely consistent with a determination on his part simply to use them in self-defence. You have heard testimony as to midnight marauders, tending to show that midnight marauders in disguise were inquiring for him, (Crow.) The testimony tends to show that the enmity was rather more, or as much, at least, on the side of the settlers against him, as it was entertained by him against the settlers. The testimony tends to show that there was a large combination of the settlers, having many hundred men.

You are to consider whether Crow would be likely to be an assailant against a whole community, or a large part of a community of that kind, or whether it is not more likely that he would confine himself to matters of strictly self-defence under such extraordinary circumstances. It is for you to consider the circumstances and to give them such weight as you think them entitled to, and determine whether or not all of these threats were not entirely explicable on the hypothesis that he was simply arming himself and carrying his arms for self-defence, and whether the cause for enmity was not as great or greater upon the other side than upon his. Those things you ought to consider, and to give such weight to them as you think they are entitled to receive in determining the acts and the motives of these men. The fact that there was that morning no ill feeling manifested between Crow and those parties, Storer and Brewer, would indicate that there was nothing dangerous contemplated, but that Crow had then no other purpose than self-defence. Whether it is sufficient or not is a question for you yourselves to consider.

Then you ought to consider whether the testimony tending to show that Crow said he intended to harvest these crops,

and if they would put him in possession he would thin their ranks, or expressions something like that, are not also entirely explicable upon the hypothesis that he intended only to act in self-defence. Crow having purchased those lands, which had been adjudged to belong to the Southern Pacific Railroad Company, he was entitled to their possession, and if there were crops growing upon those lands the products of those lands were his; the land being his the crops were his, and he had a right to harvest them if he could get possession; and you are entitled to consider whether that expression of his complained of is not explicable upon the idea that when they put him in possession, not anticipating that there would be resistance to the marshal, having been placed in possession he would maintain it, if necessary, with force, which he would have a right to do if attacked.

You are to consider whether his conduct or his threats were not explicable upon that theory, and whether he simply intended to use his arms for self-defence only. At all events there appears no testimony that at this time Crow or Hart or Clark advanced one step towards those men who were surrounding the marshal, until those men rushed in a threatening manner upon them. The testimony of all is (the testimony of both parties) that there was a rush upon them, and Mr. Clark, who gives a very graphic, and what appeared to me to be a very candid, statement of the facts,—whether candid or not is a matter for you to determine; whether true or not is for you to determine,—Mr. Clark gives a very distinct narrative of those events, and shows that he was in a position to observe clearly and carefully what took place. Whether he told the truth or not is a question for you. He tells you that while he sat, with Crow and Hart by his side in the other wagon close to him, the two wagons close together, he saw Harris swing his pistol around, or some other party, at the head of the marshal, demanding his arms, and soon after they dashed up at him, Clark, with drawn pistols. He tells you there were several with drawn pistols, and that Harris presented his pistol to him and demanded his arms in a threatening tone and manner; that he entered into some

colloquy with him; that when they were dashing up Hart reached down for his gun, and Crow, seeing the movement, told him not to shoot yet, the time had not come. And he tells you that before the firing commenced Harris stood by him, his horse's head reaching over his wagon wheel; that he stood facing him, and entered into conversation with him, with his pistol drawn and cocked, and aimed at him. Wilbur Doyle's testimony indicates that there was a rush up there by defendant's party, but does not indicate that Crow or Hart rushed down to them. In the testimony of Mr. Pryor he tells you he got there first—I think he said first—and was sitting on his horse by the side of Clark when Hart reached for his gun, and that he also heard the expression from Crow, "The time has not come to shoot yet." His testimony, therefore, confirms that of Clark, confirms Wilbur Doyle, and the testimony of the others, that there was a rush up there to Clark, Crow, and Hart, and that there were other pistols drawn.

Now, gentlemen, they—the defendant's party—were the parties, then, upon all the testimony, because there is none to the contrary, that were advancing in a threatening manner with arms drawn. There is some loose testimony of Mr. Patterson that while he was on the way up he saw Hart reaching for his gun, but he does not testify that he presented the gun, and the testimony all indicates that there was no presentation of the gun by him until these parties rushed upon them with drawn weapons. If that be so, if defendants and those with them rushed upon Crow, Hart, and Clark with drawn weapons, in a menacing manner, that of itself was an unlawful act, a threatening act. It was an assault on their part if they did it before any attack or aggressive act on the part of the other party occurred.

It is not a matter without doubt as to who shot first. Some think one, some the other. Clark thought Harris fired first. He saw him fall. Both the reports were so nearly simultaneous that the weapons of the approaching parties must have been out before they were on this ground. Now, gentlemen, if these parties rushed up there in a threatening manner,

with drawn pistols, aimed at Clark, Crow, and Hart, they committed an assault which was a breach of the peace—was a breach of the law; and if they did it in such a way that Hart and Crow, or a reasonable man in their position, would have good reason to believe, and should believe, that their lives were in danger, and that it was necessary for them to shoot in self-defence, they would be justified by the law in shooting, even if they shot first. A man who is attacked, who is assaulted with a deadly weapon, who is in danger of being instantly shot down, is not bound to wait until he is shot himself. Then if Hart did shoot first it does not affect the question, provided he was in such position that the law would justify him in shooting; whether he was in such dangerous position or not, is a question for you to determine from all the evidence in this case. Now, then, whoever it was that provoked that contest, whoever it was that was the assaulting party under such circumstances as placed the other party so assaulted in a position that justified him in shooting to defend himself, that party so assaulting is the one upon whose skirts the blood of those seven men who were killed rests, even if the party thus assaulted was the first to fire. Who it is I do not know. It is for you, not me, to determine from the testimony. If, however, they made this assault in a threatening manner, in the way that I have indicated, before any action upon the part of Hart or Crow, whatever Hart or Crow's internal unmanifested intention may have been, if the defendants thus did it, they were the assaulting party, and it was a continuation of the obstruction and resistance before commenced to the execution of the writ by the marshal. These things all occurred in a very few seconds. The testimony of all the witnesses is to that effect. The marshal testifies that it was all over before he succeeded in getting from the ground upon which he had been thrown by the rushing horsemen, and getting the dust out of his eyes so that he could see.

Gentlemen, you are to determine whether that was also a continuance of a resistance which had before already begun and been perfected sufficiently within the law or not. Imme-

diately after or soon after the firing ceased, McQuiddy and another party of settlers comes upon the ground. The marshal immediately meets him. McQuiddy informs him at once that he must leave—gives him a paper and tells him to take it and leave. That is the testimony of the marshal, and it is not contradicted. The marshal undertook to read it, but McQuiddy was so impatient that he would not even give him time to read it, according to the testimony, if you believe it to be true, and I believe there is no contradiction of that testimony; if there is you will recollect it. McQuiddy's action shows for itself that he at least contemplated resistance. He was grand master of the organization. This paper was prepared in advance. It is addressed to the United States marshal. It was delivered to him. The marshal had a right to presume it was intended for him, and that it meant what it said. It showed that this trouble or some other trouble had been anticipated, and preparation had been made for it by some action taken prior to their coming upon the ground It is addressed "To the United States marshal," and reads as follows: "Sir, we understand that you hold writs of eject-ment issued against the settlers of Tulare and Fresno counties, for the purpose of putting the Southern Pacific Railroad in possession of our lands." Whoever wrote this, and McQuiddy adopted it because he presented it, if you believe the testi-mony, was aware of the fact that the marshal held writs, and that he was there for the purpose of executing them, and it was addressed to him in view of that fact. After stating their equities again it proceeds: "We hereby notify you"— you, the United States marshal—"that we have had no chance to present our equities, etc., and that we have, there-fore, determined that we *will not leave our homes unless forced to do so by superior force; in other words, it will require an army of at least a thousand good soldiers against the local forces that we can rally for self-defence;* and we further expect the moral support of the good, law-abiding citizens of the United States sufficient to *resist all force that can be brought to bear to per-petuate such an outrage.*" Now, this is McQuiddy's declara-tion to the marshal, upon the ground, in this document.

There is no conflict in the evidence that this was delivered; there is no conflict as to its contents. Gentlemen, that is not the language of persuasion; that is the language of menace; it is the language of threat; and if the marshal believed that to express the true intent and acted upon it, as the marshal said he did, then it is not only a resistance, but a successful resistance. In connection with this delivery and command to leave, McQuiddy detailed four armed men to take the marshal out of the country, and told him not to go to Hanford. The marshal tells you he gave his orders in an imperious manner, and he understood and believed he meant what he said; and, under the circumstances, he had a right to believe that he meant it. That is the language of menace—the language of resistance—not the language of persuasion.

If you believe, then, that the marshal was there, as he says he was, for the purpose of executing that writ, although he was waiting for this interview between these other parties, but was intending to go on and execute the writ, and that he was deterred from doing it by these threats; that he left the country, and left with the writ unexecuted, by reason of them,—there was a resistance, and a continuance of any resistance before commenced; and all those who were connected with McQuiddy, and who aided or abetted or manifested their approbation of it in any way, as several did by their remarks, are equally guilty of the resistance.

Now, gentlemen, this also indicated a predetermination. This the testimony shows, and it is uncontradicted. It is all testimony derived from the defence. The testimony shows that this paper was prepared before coming there. The most of it had been prepared at least as early as the day before, and that shows, then, a preconcerted purpose on the part of somebody, certainly on the part of McQuiddy; that is to say, you have a right to infer it; whether it does sufficiently show it or not is a question for you to determine, but it indicates it. It tends to show a preconcerted purpose, because it was prepared at least the day before. The testimony indicates that it had been prepared at San Francisco and sent up. There must have been more than one engaged in the prepara-

tion. Now, then, if McQuiddy went there with this predetermined, in concert with others, there was a conspiracy also, as well as an actual resistance. It is for you to determine from the facts whether that conspiracy existed or not, and who conspired with him.

The defendant Doyle is connected with this paper, by his own testimony, and his own testimony alone. The defendant Doyle testifies that McQuiddy gave the paper to him the day before—on the 10th—and requested him to make some addition to it. He says he did not like it very well, although he saw nothing very bad in it, and did not do anything that night, but the next morning he tells you that McQuiddy came there and asked him if he had got the paper, and if he had added anything to it. He told him he had not. McQuiddy manifested some impatience, and told him that the marshal had gone out to Braden's and Storer's, as he supposed, and that Crow and Hart had also gone; that it was time for haste, and he hurried him up, and therefore he took it and added what followed; he added the reasons to it:

"We present the following facts: *First*, these lands were never granted to the Southern Pacific Railroad company"— a fact which had been determined to the contrary by the court, and determined for all time, unless that judgment should be reversed, so far as that case is concerned. "*Second*, we have certain equities that *must be respected*, and *shall be respected*." And, again, "we, as American citizens, *cannot and will not respect them*;" that is, the rights of the Southern Pacific Railroad.

Now, he knew, because McQuiddy told him, that the marshal had gone with the writ to put Crow in possession of Storer's and Brewer's land. He was urged to haste. He dictated this addition. He said, in answer to a question from the court, that it was not dictated by McQuiddy; it was his own dictation; it was his own language. Now, then, when he wrote that language he had reason to believe from the conversation, whether he did so believe or not, that it was to be used —to be delivered to the marshal. The conversation, McQuiddy's anxiety and hurry to get off, his impatience to hurry

him up, indicated all this. It was addressed to the marshal; he read it; and, by appending this addition to it, he adopted the whole of it. When he appended this and delivered the whole of it back to McQuiddy, with this appendage, having signed it "By order of the League," or "By authority of the League," he adopted the whole of it. He conferred with McQuiddy in preparing this for the marshal, and, when he delivered it to McQuiddy, that was a commendation of and concurrence in those acts between the two, and tends to show that there was a conspiracy, at least between those two. It is addressed to the marshal; it is the language of threat; and the testimony tends to show that he knew it was to be used for that purpose, and he, at least, affirmed that it was "By authority of the League."

Now, there have been several other papers put in evidence here, purporting to have been by authority of the league, but but none can be traced to the league by direct evidence, and it is denied they came from the league. It is said that Doyle consulted no meeting of the league as to this document, because there was no meeting; but, conceding it to be so, he, at least, affirms that this was by authority of the league, and McQuiddy confirms it by adopting it and delivering it to the marshal with that appended to it. They two act together in concert with reference to the preparation of this document, and for the purpose of delivering it to the marshal, as the testimony tends to show; whether it shows this satisfactorily or not is a question for you to consider. Then the testimony shows that McQuiddy immediately rode off from the house; that he went by one direction and Doyle went by another, and they both arrived at Storer and Brewer's at about the same time, or not far apart; and the testimony tends to identify them all as being upon the ground during some portion of those proceedings.

Now that tends to show a preconcert of purpose—of action—on the part of these two men, at least; and if you believe that they did thus act in concert with reference to that, then there was a conspiracy to do the thing which this document purports to do; and, if there was a conspiracy, the act of Mc-

Quiddy is the act of Doyle, even although the latter was not on the ground—even if he had not gone upon the ground—because the acts of one of the conspirators, when the conspiracy is once established, in carrying forward the objects of the conspiracy, are the acts of all the conspirators.

Gentlemen, if these acts occurred in the way that I have indicated here, there was a continuance of the resistance of the marshal which was begun on the first meeting on the ground of those parties. Now, from all this testimony, gentlemen, from the acts of the parties, you must determine whether or not there was a concert of action and a common purpose. That there was a concert in going there, the testimony shows, because they agreed upon it. There was a concert upon some purpose. The question is as to what that purpose was. Was that the purpose indicated by the acts which they did in fact perform immediately upon getting on the ground in great haste, without even waiting to consult with Storer and Brewer, or was that the purpose which they now, after the act, say was their purpose; a mere matter of persuasion, a mere matter of protecting Brewer in case he should be assaulted with an intent to murder him?

You are to determine this case, gentlemen, from all of these circumstances, and make up your minds—*First*, was there a conspiracy? If there was a conspiracy, who were guilty of that conspiracy? and then, also, was there an actual resistance? If there was, who were guilty of that actual resistance? If there was a conspiracy on the part of some and not upon the part of others, then who are those that are guilty of conspiring? Because, if Doyle is guilty of conspiring with McQuiddy, he is guilty, although McQuiddy is not on trial; he is indicted, and it is no matter that he is not on trial. If Doyle conspired with McQuiddy, as it is alleged in the indictment that he did, or with anybody else, he is guilty of every act of resistance within the objects of the conspiracy that was performed by any of the other conspirators; he is guilty with the others who carried the object out, even if he did not get there in time to assist personally in the matter.

Gentlemen, as to the credibility of the testimony you are

the sole judges, and as to what it proves. I have pointed out the bearing of the testimony. I will say, further, as to what actually took place, what was actually done there, there is scarcely a substantial conflict in the testimony. The conflict is not so much as to what the acts were; there may be some little as to some points of it. You will recollect what those points are. The conflict is not so much as to what acts were actually performed by the various parties there, as it is in regard to the purpose for which those acts were performed.

The great conflict is as to whether the purpose is what the defendants, long subsequent to the event and after these lamentable occurrences have taken place, now say was their purpose, or whether that purpose which is indicated by their acts—which is made manifest by their works—was their real purpose; and you are the proper parties to determine whether that purpose which these acts indicate was the real purpose, or whether that which they now say was their purpose, and which they did not in fact accomplish, was the real purpose.

Gentlemen, you are the judges of the credibility of the witnesses, and you are to take into consideration their situation in reference to this transaction. Many of these witnesses are defendants to this charge, who, under the law as it now stands, and I think wisely, are permitted to testify; but, gentlemen, you should scrutinize their testimony with care. They are deeply interested in this matter. Seven lives have been lost in this transaction, and they are now at the bar of justice here charged with the offence of conspiring to resist the United States marshal, and of having actually resisted him. They stand here subject, if found guilty, in the discretion of the court, to imprisonment and fine. Now, what effect this situation may have upon their testimony is a question for you to determine. And so the witnesses on the other side: you are to consider their relation to the transaction, and upon the whole come to such conclusion as you think the evidence justifies.

I am free to say that several of these defendants, in my judgment, testified with great fairness. Whether they did or not is a question for you. Some of them, I think, prevari-

cated; whether they did or not is a question for you to deter-
mine. But you are to take all of the testimony, and make
up your conclusions—*First*, did these parties, or any of them,
conspire, and do some act to carry out that conspiracy? If
they did, you will find them guilty of that charge. *Second*,
did they actually resist in the manner which I have pointed
out and defined? If they did, you must find them guilty of
that charge.

Now, gentlemen, if you find, in your judgment, beyond a
reasonable doubt, that these parties, or any of them, are
guilty, and fail to give effect to that judgment by a proper
verdict, you will prove recreant to your duties as citizens, and
violate your oaths as jurors. If, on the contrary, you have a
reasonable doubt in the matter, you are equally bound to
acquit the parties. But, gentlemen, a reasonable doubt is
not an arbitrary doubt; it is not one you may conjure up at
will. It must be a doubt which really arises out of the evi-
dence—which is suggested by the evidence, and which really
rests in good faith in your minds as a matter of doubt. You
will look at this matter as you would if you were investigating
it with a desire to ascertain the exact truth in a matter of
great consequence to your own interest, and if, upon the
whole, your minds rest satisfied of the guilt of these parties,
you must find them guilty; otherwise not guilty.

Gentlemen, in these several aspects you will be called upon
to consider this case. I will now instruct you as to the form
of the verdict. There are several defendants here. You will
look upon their cases in their different lights, and hence it is
necessary for you to understand the form of the verdict which
you should render according to the facts which you may find.
I have prepared forms here suggesting several categories
which you can consider, and adopt such form as you find in
accordance with those categories.

The *first* form is in case the jury find against the defend-
ants on both charges. In case the jury find against the de-
fendants on both charges, the form of your verdict will be as
follows:

"We, the jury, find the defendants, Doyle, Patterson, Pur-

cell, Brewer, Braden, and Talbot guilty as charged in the indictment." That is, if you find them all guilty as charged.

If you only find some of them guilty, you will simply insert the names of those you do so find. I merely insert the names so that you will know what the names are, and, if you find them guilty, that will be the form of your verdict in the first category.

*Second.* In case the jury find that some are guilty of conspiracy, and also of resisting the marshal, and some of resisting the marshal only, and not of conspiracy, the form of the verdict will be as follows: "We, the jury, find the defendants Doyle," etc.,—as the case may be,—naming the persons that are guilty of both charges, "guilty as charged in the indictment;" and the defendants A., B., etc., "guilty of resisting the marshal, but not guilty of conspiracy."

*Third.* In case the jury find the defendants not guilty of conspiracy, and guilty of resisting the marshal, the form of verdict must be as follows: "We, the jury, find defendants Doyle, Patterson," etc.,—naming those found guilty,—"guilty of resisting the marshal, as found in the indictment, but not guilty of conspiracy."

*Fourth.* In case the jury find the defendants not guilty of either charge, the form of the verdict will be as follows: "We, the jury, find the defendants not guilty."

If the facts as found present any other aspect, adapt the form of your verdict to the facts as found; as, for instance, some guilty, naming them, and others not guilty, naming them.